The next matter on the docket is agenda number 9-120-751, Barr v. Cunningham at Elk Council for Appellants. Are you ready for appellee? Thank you. You may proceed. Good morning, Your Honors. May it please the Court, Michael Kujawa on behalf of the Defendants, Appellants, Township High School District 211, and Laurel Cunningham. The case before you this morning involves an issue of vital importance to school districts, park districts, and all public entities throughout Illinois. The distinction between the standard of ordinary negligence and the definition of willful and wanton conduct found in the Tort Immunity Act at Section 1-210. The trial court in this case, at the close of evidence, granted or directed a verdict on behalf of District 211 and Laurel Cunningham, finding that there was no willful and wanton conduct as a matter of law. However, the majority decision in the appellate court overturned and reversed that finding in the trial court and remained it for a new trial. We are asking this Court to reverse the majority decision in the appellate court below and affirm the trial court's granting of a directed verdict on behalf of District 211 and Laurel Cunningham, or in the alternative, to affirm the trial court's verdict on behalf of the Defendants based on Section 2-201 discretionary immunity in this case. I would focus first on the willful and wanton conduct argument and issue in this case. The majority decision in the appellate court below really waters down the definition of willful and wanton conduct so much as to make it virtually indistinguishable from negligence. And the appellate court decision, in the majority decision, it directly contradicts this Court's holdings in Lynch v. Board of Education and in Harris v. Thompson. The dissenting opinion in the appellate court below, written by Justice Mason, makes two very important points, I think, for this Court's consideration. First, Justice Mason, in analyzing the evidence that was presented to the trial court, Judge what we have here really is a quintessential example of a teacher doing at worst, or taking at worst, insufficient precautions for a student's safety or for her student's protection. And that this Court, in Lynch v. Board of Education, had determined that such a failure does not amount to willful and wanton conduct as a matter of law. Justice Mason, in her dissent, also pointed out the fact that what the majority decision is really requiring is that public entities take every single possible precaution to prevent all injuries, no matter how remote or improbable those injuries may seem. Otherwise, they're going to be held liable for willful and wanton conduct, or have that possibility of being held liable for willful and wanton conduct that nearly approaches strict liability when we look at physical education or recreational activities. In reviewing the appellate court decision below, I found it rather odd, in fact, that the first six or seven pages of the decision, I was sure that the Court was going to affirm the trial court's decision, because the appellate court majority did recognize the standard in Lynch, that you analyze the teacher's actions to see if the teacher took any deliberate, identifiable steps to care for their student's safety, to protect their students. So the appellate court majority recognized the standard in Lynch. Then the appellate court majority went through the laundry list of things that the teacher, in considering the safety of her students when they were engaged in floor hockey. But near the end of the decision, all of a sudden, the appellate majority turned 180 degrees and decided that they were going to decide to reverse that decision based on one decision. One decision made by Laurel Cunningham, which was not to mandate the use of an optional piece of safety equipment, the safety goggles in this case. So the appellate majority said that decision alone, even though there are all this laundry list of things that the teacher had done, that one decision is enough to create a question for the jury on the issue of willful and wanton conduct. In reaching that decision, the appellate majority really ignored the question when we talk about what a teacher must do, and when we analyze a teacher's actions regarding willful and wanton conduct. The Lynch case expressly recognized that a teacher who takes precautions for student safety, even if those precautions are in hindsight deemed insufficient, has not... Does willful and wanton require intentional conduct on behalf of the defendant? No, it does not require intentional conduct. The standard is, if it's not intentional, is it a course of action which demonstrates conduct that could be seen as utterly indifferent or consciously disregarding the safety of others. So clearly in this case, there is no intentional conduct on behalf of Laurel Cunningham regarding the safety of her students. And I don't believe there is any way you could say as a matter of fact that her conduct rises to the level of willful and wanton conduct. Not when you analyze that evidence based on the Tort Immunity Act definition, or when you analyze that evidence based on the standards set by this court in the Lynch or in the Harris v. Thompson case. Under Section 2-201, is a bad judgment call the equivalent of a policy decision or exercise of discretion? Under 2-201, for discretionary immunity, a bad judgment call is a discretionary decision. But so is it a determination of policy while exercising discretion? It depends on the facts. Certainly in this case it is, because there is no mandate of law or any sort of guide out there which would say, first of all, to a teacher who is running, a physical education teacher who is having a heart rate day and providing a number of alternatives for her students to engage in exercise to raise their heart rate on that day, what activities they can engage in, and if they're going to play floor hockey, what they do while they're playing floor hockey in terms of the safety equipment that must be used, how many students will play, all of the decisions that Laurel Cunningham made when running her class. The evidence in this case was undisputed that she alone had the authority to determine how her class was going to be run, what activities they were going to do, what optional activities would take place on heart rate day, how many kids would play floor hockey, what equipment would be used, what the rules would be. And so without a mandate of law, she did make a policy determination by balancing competing interests. She had 40 some kids in her class and the goal that day was to get their heart rates up to a certain level in order to try to engage student involvement and have students actually hopefully want to participate in some of these activities. The other options maybe didn't seem all that great to those students. I mean they had the option of running laps, jumping rope, or running stairs. And there's these 12 kids who have done it 8 or 10 times in the past who said, none of those sound very fun to me, I'd much rather play floor hockey. There was some evidence in the record that there was absence of prior injuries to students playing floor hockey. Is that relevant in determining whether there was willful or unwilling conduct? Yes it is. Because when we look at both the Tort Immunity Act definition under 1.2.10, what they talk about there is a course of action which demonstrates that we analyze when we're looking at willful and unwilling conduct. It doesn't say a single act. And so one of the things, one of the multiple things that Laurel Cunningham considered when deciding what is the safest way to run floor hockey in my class was the fact that she had never seen, nor had anybody else within the district or at Conan High School, had ever seen anyone else suffer an injury while playing floor hockey, or an eye injury, anything even remotely like this. Now if the facts had been different and there had been multiple cases of injuries while playing floor hockey or multiple eye injuries while playing floor hockey, serious injuries, certainly that's another factor that weighs in when we talk about a course of action, the things that she was thinking of. But we also have to go to the Harris v. Thompson case in which this court looked at willful and wanton conduct as a matter of law on a directed verdict issue and said, you have to look at the totality of the evidence. And that is not what the majority decision below did here. They viewed that decision regarding making the goggles, whether those should be optional or required equipment, they viewed that decision in isolation. And they pretty much ignored the rest of it and said, but we can look at this one thing, this one decision made by that teacher and say, you know, I think that could be a question a jury might find that that's willful and wanton conduct. Even when they said, you know, the evidence isn't very compelling or isn't very dramatic, but, you know, we think that that should be allowed to go to the jury. In Harris, it was the same sort of thing. You have to look at the totality of the evidence. And in this case, when considering the totality of the evidence regarding all of the steps and decisions that Laurel Cunningham made when thinking about the safety of her students, it's clear that this is not a question for the jury. Just as in Harris, there were specific case-specific, fact-specific safety things that were available to the ambulance driver in the Harris case. And they had lights and sirens, and the sirens in those ambulances, you can, there's different modulations. You can change it as you're going along. And so what did the ambulance driver do in Harris? He made a decision that he wasn't going to put that siren on and leave that thing running the entire time from the moment the transport began until they got to their final destination. They made the decision that they were going to turn it on and off. And it was available to him. He could have made the other decision. He could have left that siren on the entire time. But this court looked at that evidence and said, you know, based on the totality of the evidence, we can't say, that's not Wilflin 1. We can say that's not Wilflin 1 as a matter of law. Because look at all the other things they did. He slowed down every time he approached the intersection. And when there was a traffic coming, if he saw traffic in either direction, we would stop. Otherwise, he would proceed slowly through the intersection. He did flip on the siren as he approached each intersection, but then would turn it off in between intersections. So based on the totality of the evidence in Harris, just like in this case, there is no Wilflin-Wanton conduct as a matter of law. When you were discussing or defining Wilflin-Wanton as utterly indifferent or a conscious disregard, is it your argument that if the teacher did anything, that shows that there is no conscious disregard, even if it's woefully inadequate? If the teacher did anything to protect the students? Well, I think when we look at the case law that's out there, obviously for Wilflin-Wanton conduct, most cases aren't decided as a matter of law. It's going to be a question of fact for the jury. But when we consider the cases that the court has decided as a matter of law in Wilflin-Wanton conduct, I don't know that you can come up with a bright line test to say if they just do one thing, one thing that indicates or demonstrates safety or the other. That's enough to say, well, then Wilflin-Wanton is not a question of fact for the jury. I think, again, you have to analyze the totality of the evidence. And each case is going to be somewhat fact-specific. When you look at, say, the Murray case versus Chicago Youth Center, when you balanced out the various decisions made by the instructor in that case, there were a whole number of things that should have been done, guidelines that weren't followed, training that wasn't provided to the teacher, a lack of spotters, all of these things that the court went through and said, you know what, yeah, certainly there was some thought. It's not intentional conduct. Nobody intended for that child to get hurt. But when we look at that based on the totality of the evidence, when we consider the course of action, we find that that is a question of fact, which we can't decide as a matter of law in Wilflin-Wanton conduct. But in this case, when you look at the weight of the evidence, the totality of the evidence, Laurel Cunningham used, first of all, they had the modified equipment. I brought the safety ball. I mean, this is softer than a tennis ball or a racquetball or I would say probably any ball that is used in a ball sport in a physical education or recreational activity, whether it be a football, baseball, basketball, softball, soccer ball, whatever the case may be, it's a safety ball, a soft safety ball. And they used plastic hockey sticks as opposed to wooden hockey sticks. They had a number of rules. She limited the amount of players because of the space that was available to them. So there was only 12 players. Those her particular safety rules of floor hockey were going to be. The game was supervised. She was refereeing the game. And the kids who testified in this case, including the plaintiff, said, we knew what her rules were. We knew she would be watching the game. We knew that if we didn't follow the rules, she was going to blow the whistle and the game was going to stop. And perhaps if we weren't going to be playing floor hockey anymore, I'd have to be running stairs or jumping rope. So the kids knew what the rules were. And her rules were pretty expansive in terms of trying to maintain the safety in that classroom. When we look at the no high sticking, the no slap shots, keeping the ball on the floor, no slashing, no jabbing, no tripping, all of the things that you often see in a hockey game, those were all taken out of consideration for the P.E. class, heart rate day, floor hockey activity. And Laurel Cunningham and looking at, based on the totality of the evidence, her course of action, looked at this and said, hey, I have, I don't think that the goggles, I actually brought the goggles too, these goggles, not even a hockey specific piece of equipment, just some goggles. And nobody even knows how many there were because no one ever wore them. No one ever used them. Mr. Payne had testified, I think, that once or twice he had a kid with an eye condition or maybe contacts, might put them on. But not even for hockey because he didn't teach floor hockey. Sometimes kids might put them on for basketball or something else. It's an optional piece of safety equipment. She said, I just don't believe these are necessary for the floor hockey game that we're playing here. And granted, Evan Barr did get hit in the eye with the safety ball. It's an unfortunate incident. But again, you look at the standard, were her, she did take many precautions for the safety of her students. And yes, an injury occurred. In hindsight, you could say, well, those precautions she took were perhaps insufficient because we have an injury in this case. But you know, you start to go down that road and that analysis, you've changed the standard. You've gutted the definition of willful and wanton conduct. You've undermined this court's holdings in Lynch v. Harris. You've undermined the public policy of the Tort Immunity Act because if this is going to be the standard for willful and wanton conduct, well, then you'll never be able to get summary judgment or directed verdict regarding no willful and wanton conduct as a matter of law. Every single case that is filed against a public entity, school district, is going to be, you'll have to go to a jury trial. It'll be a question of fact for the jury. And you'll never have that potential to get out of the case. And you talk about litigation costs alone, or the cost of insurance for municipalities. We know municipalities are underfunded in Illinois. This has public policy implications, the majority decision below, because it's an improper application of the analysis set in section 1, 2, 10. And when you think about the teachers, you know, a teacher should be encouraged to take as many safety precautions as they can in dealing with their students, and not criticized for, in hindsight, with hindsight's 20-20, to look back and say, well, gosh, you know, you did have an injury. They'll be criticized for that one thing that they didn't do. Because every single physical activity or recreational activity, physical education thing that students are going to do involves the risk of some injury, including injury to the eye. Whether it's tennis, basketball, football, all of them. You can have kids poked in the eye, hit with an elbow, all of these things. I see that I'm out of time. But I would respectfully ask that this Court reverse the appellate court decision. Thank you. Counsel? If it may please the Court, my name is Miriam Hafizy. I represent the plaintiff, Apolli Ebenbar. This case, what originally began as an appeal of a directed verdict, an improperly decided directed verdict, has evolved into something that's going to have really huge implications for Illinois. We're dealing with the issue of discretionary immunity, and we're dealing with Wilflin-Wanton Conduct in the school context with the Tort Immunity Act. And so the decision today is going to be important for everybody. And what's nice about this case is that it can provide two very nice bright line rules that will help clarify the law that's already out there. With Wilflin-Wanton Conduct, just as all of the judges have split from the trial court through the appellate court. And what you said, is that necessarily so? I mean, if we disagree with you on Wilflin-Wanton, do we need to get into discretionary immunity? I think it's an opportunity to do so, because it's been raised at every level, and it was ruled on by the appellate court below. And it will help clarify Corson and this case that are on the books that essentially conflict each other about discretionary immunity in the school context. So, with Wilflin-Wanton Conduct, it's a course of action that shows a conscious disregard. They point to all of the things that Ms. Cunningham did that showed that she was consciously regarding their safety. Of course she was consciously regarding their safety. She's a teacher. I think that that's probably the case for most teachers. She consciously disregarded throughout every single time that they played floor hockey that there was a risk of eye injury. And she acknowledged that the ball does not stay on the ground. The ball goes up, can hit the face, can hit the eye. And Evan did suffer that very injury. And what makes this case distinct is that the protection to protect against that very injury was right there with the other hockey equipment. But every sport has opportunities for injury. Not just the eyes, the neck, the elbow, the finger, ankles. And so you're saying that every time a teacher hasn't done something in a particular sport, that it's going to be Wilflin-Wanton Conduct? No. I think that... But you said in the beginning that there's going to be two bright line rules that we should address. And it does seem like that might be a bright line rule you're asking us for. The bright line rule for Wilflin-Wanton Conduct would be if there is already the safety equipment available, whatever classroom that's in, whether that's PE, whether that's chemistry, wherever that may be, if it's there, it should be used. Because the school district took the time to buy it. And it's there for a reason. It's because that injury is clearly foreseeable. How that injury may occur, we don't know. But it's there. And so they took the time to protect against it. So it's the teacher's responsibility to make sure that the kids wear it. Because no high school kids are going to voluntarily go and pick out glasses to wear on their own. Do we know how many glasses were in the... equipment and she didn't know. And that's part of her conscious disregard to not know what was available to her and if it was sufficient for the number of kids that were playing floor hockey. Because the kids that were playing floor hockey, there was 12 out of the 45 kids in her class. And so theoretically she kept the floor hockey kids in a smaller group because of space and time and so it wouldn't be too crazy. You said earlier that the decision that she made not to direct them to use the goggles and she'd made that decision on every time they played floor hockey and that was the course of action. Is there anything else that you rely on for her course of action in this case? No. No. And from the opening statement in this trial, through the jury instructions through today, the issue in this case has been the failure to utilize the goggles that were available for use in floor hockey. So if the school district didn't buy goggles, you'd have a different outcome? Absolutely we wouldn't be here. We wouldn't have survived a 2-6-19 motion. And even though it wasn't clear they were hockey specific, is that correct? Mr. Pena testified that he assumes they were. They were purchased before he got there as the PE department chair. But they were kept with the hockey equipment. But theoretically they could be used for anything. But when Ms. Cunningham was put on the stand, she was the first defendant witness that I put on the stand. She testified that the goggles were kept with the hockey equipment and she presumed them to be for floor hockey. So would the position be the same if the goggles were stored in a closet or a bucket by themselves? I think that if there are goggles, safety goggles, in the gym PE class, then it becomes a discretionary decision, okay, do we need it for this particular activity? And there are going to be some activities that would require it and some that don't. I would say floor hockey would be one that would because you have a ball that's small, that can hit you in the eye, and that you can't control where that ball is going to go. So that's exactly the type of activity that would call for it. At the time of the hockey game, what did the other students, the other students who weren't playing hockey doing? What were they doing? Running laps. Running laps. Yes. They had the choice. They could either play floor hockey or they could run laps. And these kids that were playing floor hockey regularly played floor hockey on these heart rate days. So this was, again, this was something that they were used to. And they listened to the teacher and her rules. So if she would have told them you need to wear goggles, they would have done that. Does it make any difference that there had never been an injury to an eye before? I don't think so because if we set that standard, that's sort of like the one bite rule in a dog bite case, you don't want to set that standard where you have to have some injury that happens first and then that person gets a free pass and then only then can you claim for another injury. What's important is the foreseeability of injuries. So we know that she testified that it was foreseeable that eye injury or face injury could happen. And there was goggles there so clearly the school district also foresaw injury. So the foreseeability of the injury was there and therefore she could have easily taken the precautions to prevent that very injury. Is it likely injury or is it something that could possibly happen? Is that the standard? I think the nature of what might happen to the eye, I don't think the type of injury that could happen to the eye, I don't think you could possibly say because that would be speculative. But just the fact that any injury could happen to the eyes, regardless of what that type might be, is enough. I'd like to go back to your bright line rule and if there are goggles provided. And it's been mentioned a couple times that we don't know how many pairs of goggles that there are. So is it your position that if you have a box full of equipment and maybe two pair of goggles that are there because they teach racquetball at one point and when the two people are using them they put on goggles, something that you normally wear goggles for, because those two pair of goggles are there, that they would have an obligation to buy goggles or do they just give the two pair of goggles out and the rest of the kids take their chances? Or what's your position on that? If you're talking in floor hockey itself, if there were only two goggles, then I would say that the teacher has to make that call about who should use it and I would assume she would probably put them on the goalies because they're going to have the balls going at them. But in that case, if Evan playing on the field and not a goalie got hurt in the eye and there were only two available goggles and she chose to use them on the goalies because that's more likely that they're going to be hit in the eye, then I don't think we have a case. So what do we do with the fact that we don't know how many, I mean there could have been one pair of goggles, right? Right, but there's no evidence to the contrary that there was not enough goggles. So I don't think you can hold us responsible for there being insufficient goggles. They just don't know and that's on them for not knowing. So we can presume that there was enough because she didn't say that there wasn't enough, she's just not sure. She knew there was not enough for 45. She didn't know if there was enough for the 12. And so I think that's kind of an irrelevant point about how many goggles were in the box or not. But what is important is that there were goggles and they prevent eye injury, Evan sustained an eye injury. In any circumstance where you have an available piece of safety equipment, the teacher should be required to utilize that because that's the efficient use of the taxpayer's money, the school district's decision, and it keeps the kids safe. And that's really the point. And it still preserves the Tort Immunity Act for negligent acts, which is in those circumstances where there's different factual circumstances, you can analyze it accordingly. If there was only two available, not for the whole class, things like that. But in a case where you know that there's sufficient safety equipment for the activity that would prevent the injury at hand, that's an easy bright line rule, I think. Back to Justice Burke's question, let's just say we had all kinds of hockey equipment in there, you know, the used hockey equipment from the hockey team. There's always a chance of injuring all kinds of parts of the body. So this instructor then would have to say, wow, we've got chest pads, we've got knee pads, we've got leg pads, and these kids have to go out there like, you know, I'm just going back to your bright line rule. I think that, yes, if they happen to have items like that from the club team, sure, why wouldn't you use that? Hockey players are dressed like that all the time, so I don't think that that's hindering to them. And this would be no different if you were in a chemistry class and you had eye goggles and you don't expect anything to happen from an experiment, but something does go errant, and then if someone gets injured in the eye, well, that easily could have been prevented. Would that bright line rule discourage municipalities or school districts from buying any kind of equipment like that? You mean because then they would be better to not involve? Right. You already said earlier that if there weren't no goggles, there would be no problem. So I'm just wondering where this takes us. Is the policy implications that we would be discouraging them from making decisions on having things that teachers might want to use but maybe don't have to use? I think that Artiman decided that issue of whether the school district has to provide equipment or not. And I would hope, as a reality, that they're always trying to do the best that they possibly can with the budgets that they have. So if they can't purchase a certain safety equipment, then they can't, and they shouldn't be sued for that. But if they do take the time to do it and purchase that, then they should be used. That seems like a very simple bright line rule that can be applied that will protect everybody's interest. Is there any proof, though, that the goggles were actually purchased for hockey as opposed to racquetball or tennis or ping pong or lacrosse? The testimony was that they were purchased before the people who were... So no one knows? No one knows, but everybody presumes they were for floor hockey based on where they were captured. So they just presumed because it was in a box with other equipment? The defendants presumed. I mean, this is from the defendants themselves. They presumed that they were for floor hockey. And this includes the department chair, Ms. Cunningham herself, and the athletic director. Does it matter if the school had a policy, if the school board directed a policy on use of goggles, and is there anything in the record to indicate that other than the speculation that the appellate court engaged in? There was no policy about the use of any safety equipment whatsoever. So this is solely based on Ms. Cunningham's decisions in the classroom. I don't think that... I think that she would be held just as responsible if there was such a policy in place and she didn't follow it, then it would just be further evidence in support of our case. But I don't think that's required in order for us to have the case. And I think what's important here is that willful and wanton conduct is a conscious disregard of a known risk. And Ziarko says that it's a continuum. So it can be anything close to intentional or anything just above negligence. And that's the key here. And in a situation where you're dealing with teachers, you're probably going to be on that lower end of the continuum because you're going to be hard-pressed to find a teacher who's not being careful or trying to be careful. It doesn't mean they can't make mistakes, and it doesn't mean that the school shouldn't be held responsible for the injuries that are caused. And if I may turn to discretionary immunity for a moment. I just want to ask one more question. So back to under Section 2-201. So this may be just a bad judgment call on her part. Is that equivalent to a policy decision or exercise of discretion? It's an exercise of discretion. It is not a policy decision. A policy decision, I was just going to go there with 2-201. The discretionary immunity statute was created for purposes of immunizing the high decision-makers, the executive function, when they have to make those hard calls about how we're going to allot money and how we're going to allot resources. And they can't possibly do everything that they'd love to do, their wish list. A teacher carrying out the ministerial duty of conducting a P.E. class, she does that with discretion, but that's not exercising policy. She is following the policy that comes down, which is you are a P.E. teacher, that's what you're hired for, so you don't teach math. And you have to teach P.E. within our curriculum, meaning these are the approved curriculum things that you can do during P.E. class. These are the requirements that you have to meet during the time that you're teaching our kids so that they can graduate. Whether she chooses to do floor hockey on a heart rate day or have the kids run laps, that's her discretion, but that's not making policy. And her deciding what her rules are going to be for floor hockey, again, is ministerial. Because she's told, okay, floor hockey is part of your curriculum, conduct it how you will. It would be no different than a history teacher choosing to use a PowerPoint to teach his points versus, you know, using a lecture. That's their choice, but they're carrying out the ministerial duty of being whatever teacher they were hired to be. And so I think that is a difference. It's not as hard. It's her position that teachers' decisions are ministerial as a matter of law. That's right. And I think that, again, that would be a bright line rule we could establish with 2201, is that the policy, the 2201 immunity is for those high-level executive functions, not for teachers, for example, because then it's a slippery slope as to, well, how far down does that go in the public employee chain? In a school system, the teachers are essentially at the bottom of the hierarchy, and then they have their department heads, they have their athletic directors, they have principals, assistant principals, superintendents, and on up. And so they're getting all of their instruction all the way down this long hierarchy. So the discretionary immunity is supposed to protect the superintendents, the boards, the public offices that are held that have to make the decisions with the taxpayer money, not what the teacher is doing in her day-to-day classroom, because the school board might not even know how to conduct a PE class, but they're making sure that when they hire someone that she has the qualifications to teach PE and then they're sending her out to do so. And so discretionary immunity, we can make that bright line rule and overrule Corson and say that, Corson, that went too far. That wasn't an exercise of policy how he conducted his shop class. That was a discretionary decision that he made, but he wasn't making a policy determination by removing the safety shield from the saw. It appears that Ms. Cunningham, in this situation, too, there were really no rules in PE regarding goggles, and they happened to be there and she wasn't told by anybody to actually use them. So all the other equipment seemed to be adjusted for safety purposes and her discretion. And actually that's false, because the school purchased the plastic hockey sticks and replaced the wooden sticks and then replaced the old balls with the new safety balls. Right. They purchased it, but who decided that? The school board, above Ms. Cunningham. So they do go into the curriculum and decide what needs to be done. Right, right. And then they made that decision. But they didn't make the decision with regard to the goggles. Not in the time that they knew, because Ms. Cunningham had only been there about a year when this happened. Well, at least no one knew. Right. And Mr. Pena had been there and he didn't know when they had been purchased, but he knew that they had been purchased before. He presumed they were. And so she's not making a policy determination by choosing to or not choosing to use the goggles. That's a discretionary decision that she made, but that's not an exercise of policy. And unfortunately, those two terms are so closely synonymous that they sound like they can be the same thing, but they're really not. And I think that's why it would be really helpful for this court to set out that bright line rule to really distinguish the difference between policy makers and those carrying out their ministerial duties with their own discretion. Because I think that's what we all do. Can an argument be made that if the school board does not set a policy that delegates that authority to the teacher, the teacher is then in fact making a policy decision? No, I think that's them charging them with their discretion to conduct their class within the rubric of the policies that they made. And so I've just got a little time left, so I will say that I would hope that this court will affirm the First District's decision and both clarify willful and wanton conduct in the context of the Tort Immunity Act as well as discretionary immunity. Thank you very much. Thank you.  Thank you, Your Honor. So if I understand counsel's argument correctly, we are really talking about really gutting two provisions of the Tort Immunity Act here, not only 1.210, the definition of willful and wanton conduct, but also 2.201, discretionary immunity. The bright line rules that counsel is arguing here are completely unworkable. If we talk about the idea that any piece, I believe the bright line rule that she is advocating is that there is no such thing as optional safety equipment anymore. Every single piece of safety equipment that is within the four walls of that school or within the equipment closet in this case, and I wish now we had pictures and an inventory of every single piece of safety equipment in there because perhaps there are some knee pads in there from some basketball session years ago or some other piece of safety equipment. But now that they're there and it's a readily available piece of safety equipment, which in hindsight may have prevented some injury, now that's a question of fact on willful and wanton conduct that has to be decided by a jury and can't be decided as a matter of law under the bright line rule. And I think the court points it out. The problem here would be, well, then if that's the case, then school districts are going to say, we're not going to buy safety equipment because, you know, let alone optional safety equipment. Why would we buy any safety equipment at all? Because we know then if it's a school board determination, and it's a termination policy, exercise of discretion under Aardman, then we're not going to take the risk. We'll prevent that from happening right up front, and we just won't buy safety equipment. But really it's a slippery slope here to the point where school districts and park districts decide to say, you know what, we're not going to offer these activities anymore. Yeah, we'll have physical education, but it'll be a lecture-based course because no matter what we do, no matter how many steps we take to try to promote safety, you cannot predict every single possible incident that might occur, and you cannot take every single possible precaution. These goggles, if they were in the ‑‑ and the testimony, I completely disagree with counsel on the testimony regarding Mr. Pena, the department chair for physical education. What he said was, no, no one knows that they're kept, they were in the same equipment closet and in the same area as the floor hockey equipment. But the equipment closet contains the equipment for physical education. And so if this is now an optional piece of safety equipment, which according to the bright line rule they're advocating is mandatory, must be mandated, even without any sort of policy or anything requiring it, well, then it's going to be mandated for basketball so that a kid doesn't get poked in the eye while they're jostling around in the paint. It's going to be mandated for tennis because kids smack tennis balls back and forth towards each other and somebody might get hit in the eye. It's going to be mandated for badminton because you might get hit with the birdie in the eye. And it's going to be mandated for every single other activity in which it's reasonably foreseeable that someone might sustain an eye injury, which is essentially every single physical activity that takes place. Look at heart rate day alone. You've got four activities that were options for the kids. You've got jump rope. So if you have six kids standing around in a general area jumping rope, isn't it foreseeable that somebody's hands could get sweaty and that rope could fly out of their hands and hit a kid across the way, perhaps even in the eye? So now you've got to decide, well, am I going to have my optional safety goggles used for floor hockey or do I have to put them on the kids' jump and rope? But that would be hitting somebody as a bystander if it flew out. Well, certainly, but when you look at foreseeability, you could say if I am going to have, of my 45 kids, I've got 10 kids who say they want to jump rope and the jump ropers are going to be over in this area of the gym. Isn't it foreseeable, possibly, that some kid may drop his rope or let go of the rope and it could fly out and hit somebody in the eye? This is where we get to, I mean, there are so many reasons to overturn the appellate court decision here on willful and wanton conduct and on the failure to follow the analysis this court set out in Lynch and in Harris. The idea that we're going to, this is a, there's no doubt in this case, that District 211 is a local public entity entitled to the immunities and defenses contained within the Tort Immunity Act. So to try to use the ZRCO definition of willful and wanton conduct and say, well, it's just a shade past negligence, that's enough to find negligence against a public entity, that is completely false. This is, 211 is entitled to the Tort Immunity Act definition of willful and wanton conduct, which is a far cry from the ZRCO definition of willful and wanton conduct. And it shouldn't even be an issue in this case because that was the definition that was used by Judge Shelley in granting the directive verdict. It was even the definition that was used by the appellate court majority and the dissent in looking at, in reaching their decision. So why we're now talking about ZRCO, I don't know, but it's inapplicable in this case when we're talking about Section 1-210. And then, you know, when we talk about the bright line rule of discretionary immunity under 2-201, I don't know where in each particular public entity you would have to draw the line, whether it's somebody who's in the, say, in the control group or there was one reference in one of the briefs on plaintiff's side regarding, well, it should only be given to elected officials. But that's not what the statute says. The statute says a public employee, when engaged in the exercise of discretion and determining policy and exercising discretion. And it's a public employee. That's what the statute says. And if we look at the discretionary immunity analysis, certainly in Haranek, which gave discretionary immunity to the city of Chicago for the fire marshal, that's not an elected position. Certainly they're somewhere up in the chain of command, I suppose, in the fire department. But it's not as though the court has said, well, no, it's only because they're the fire marshal. What they said was it was a public employee who balanced competing interests, who looked at the situation and said, I have all of these people that I have to handle while I'm conducting my fire drill. I have to put them somewhere. And he made a decision to put them over by the door. And the door was open and somebody was injured. And there they said, this is a public employee balancing competing interests of time, efficiency, safety. And that's exactly what Laurel Cunningham was doing in this case. She had 45 kids in her gym class. They had to get their heart rates up to a certain amount. She had so much space within the gym. She had a certain amount of equipment that could be used. There was only so many activities that she could supervise at any given time. She had these kids who liked to play floor hockey. And you know what? Anytime you can get a kid in physical education to like the activity that they're engaged in, that's fantastic. Of course she's going to want to encourage that. She should be encouraging that because it's far more likely that they're going to get their heart rate up to where they're supposed to get it and fulfill the desires and the goals of the class if they're doing something that they like to do. And so she thought, well, look at the modified equipment we're using. And nobody had ever worn the goggles playing floor hockey. And the only testimony regarding anybody ever using them was from Mr. Pena, the department chair, who said, I don't know what those things were bought for. They've been sitting around for a long time. Once or twice they had a kid come in with an issue with the eye or a contact, and it wasn't even floor hockey, but they put them on. So that's the only time those things were used. So to take that, to take that optional piece of safety equipment and say, well, guess what? You had it in your school. Now all of a sudden it's a mandated piece of safety equipment. That bright line rule will simply not work and should not be applied in this case. What should be done in this case is the analysis that this court used in Lynch v. Board of Education, the analysis that this court used in Harris v. Thompson regarding Wolflin-Watton conduct as defined by, I know it wasn't in Lynch, but certainly in Harris, the Tort Immunity Act. That analysis should be used. The standard should be when we analyze a teacher's conduct, did they take any demonstrable, identifiable steps for the safety of the students? It shouldn't be this new standard that the appellate court majority put in here, which is you have to look and see did they take every single precaution to prevent every single possible injury because that is an impossible standard and it flies in the face of public policy regarding tort immunity, regarding public entities, regarding physical education, and for all of those reasons, this court should reverse the majority decision in the appellate court and I'll find it in favor of District 11 in the roll calling it. Thank you. Thank you. Case number 120751, Barr v. Cunningham, MNL, will be taken under advisement as agenda number nine. Mr. Kajawa and Ms. Hafezzi, I thank you for your arguments today. You are excused. Mr. Marshall, the Illinois Supreme Court stands adjourned.